**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

DEIDRA CLAYTON, ET AL.                                   CIVIL ACTION

VERSUS                                                          No. 11-845

COLUMBIA CASUALTY COMPANY, ET                     SECTION I
AL.

<u>ORDER AND REASONS</u>

Before the Court is a motion[1] for summary judgment filed by defendant, Deputy David Johnson, and a motion[2] for summary judgment filed by defendant, Sheriff Willie Graves. Plaintiffs, Deidra Clayton and Angela Burke, oppose the motions.[3] For the following reasons, the motions for summary judgment are **GRANTED**.

*BACKGROUND*

Plaintiffs allege that David Johnson, a Livingston Parish sheriff's deputy, shot and killed Jonathan Clayton ("Clayton") on April 4, 2011, without justification, while responding to a 9-1-1 telephone call reporting a domestic dispute between Clayton and his girlfriend, Krystyna Westmoreland ("Westmoreland").[4] The disturbance was reported by Clayton's sister, Angela Burke ("Burke"), after Clayton beat Westmoreland with a metal object on the porch of the trailer located behind Burke's house.[5] Burke reported to the police that Westmoreland was twenty years

---

[1] R. Doc. No. 42

[2] R. Doc. No. 43.

[3] R. Doc. Nos. 53, 55.

[4] R. Doc. No. 1.

[5] R. Doc. No. 42, Exhibit B-1.

Case 3:11-cv-00845-LMA-DEK   Document 90   11/16/12   Page 1 of 39

old, pregnant, and that she was "profusely bleeding out of her head."[6] Burke further reported that they were taking refuge in her home waiting for the ambulance to arrive, armed with a gun, and that she would shoot Clayton if she had to defend herself.[7] As they waited for police and an ambulance, Burke reported that Clayton had a knife and that he had broken the windows on Westmoreland's black Honda Civic and slashed the tires.[8]

When Deputy Johnson arrived on the scene, Burke signaled to him that Clayton was in the back of the property by the trailer.[9] Deputy Johnson could see Clayton peering out of the open door to the trailer.[10] Clayton retreated inside the trailer as Deputy Johnson drove down the driveway to the trailer and parked behind Westmoreland's damaged vehicle.[11] Deputy Johnson stepped out of his unit, drew his gun, and walked up the porch steps to the trailer.[12]

Deputy Johnson approached the trailer door and ordered Clayton to come out.[13] Deputy Johnson recalls that Clayton responded that he had a gun and that he threatened to shoot the officer.[14] Deputy Johnson stated that Clayton eventually emerged from the trailer with one hand

---

[6] *Id.* at 00:40-1:00; *Id.* at 2:10-4:00. Burke later testified that Westmoreland had been lying about being pregnant. Burke testified that she did not know Westmoreland was lying when she reported that fact to the police. R. Doc. No. 88-1, p. 35.

[7] R. Doc. No. 42, Exhibit B-1, at 11:30-12:15.

[8] *Id.* at 14:30-16:30.

[9] R. Doc. No. 42-9, ¶ 5.

[10] *Id.* at ¶ 6.

[11] *Id.*; R. Doc. No. 88-1, pp 88-89.

[12] R. Doc. No. 88-1, p. 89.

[13] *Id.*

[14] R. Doc. No. 87, p. 47-49; R. Doc. No. 53-8, at 8:30-9:00. Officers can be heard on the 9-1-1 recording advising that Clayton was threatening to shoot. R. Doc. No. 42, Exhibit B-1, at 18:55.

behind his back.[15]  Deputy Johnson claims that he believed Clayton was holding a gun behind his back until Clayton turned away and headed back towards the trailer.[16]  Deputy Johnson could see, at that time, that Clayton was holding a knife behind his back, not a gun, as Clayton walked back to the trailer door.[17]

When Deputy Johnson ordered Clayton to come back down from the porch, Clayton began cutting himself with the knife.[18]  Deputy Johnson watched as Clayton pulled the knife blade across his neck, attempting to cut his own throat, while yelling at the officer, "You see what you're doing?"[19] Deputy Johnson claims that he responded, "As soon as you come back out, I'll back down off the porch, man. Put the knife down.  Put the knife down."[20]

Clayton then began to approach the officer in a hostile manner, throwing his hands in the air, and yelling at the officer to shoot him.[21]  Deputy Johnson walked backwards off the porch, down the steps, and away from the trailer with his gun drawn.[22]  Clayton left the porch and continued to ignore commands to get on the ground as he came towards the officer.[23]  Although the parties vigorously dispute whether Clayton still had the knife at this point, it is undisputed that Clayton kept walking towards Deputy Johnson, refusing to obey his commands, hollering

---

[15] R. Doc. No. 87, pp. 47-49; R. Doc. No. 53-8, at 8:30-9:35.

[16] R. Doc. No. 87, p. 49; R. Doc. No. 53-8, at 8:30-9:35.

[17] R. Doc. No. 87, p. 49; R. Doc. No. 53-8, at 8:30-9:35.

[18] R. Doc. No. 87, pp. 49-50; R. Doc. No. 53-8, at 9:30-10:20.

[19] R. Doc. No. 87, pp. 49-50; R. Doc. No. 53-8, at 9:30-10:20.

[20] R. Doc. No. 53-8, at 9:30-10:20.

[21] R. Doc. No. 88-1, pp. 93-95.

[22] R. Doc. No. 53-6, at ¶¶ 16-17.

[23] *Id.*;  R. Doc. No. 88-1, pp. 93-95; R. Doc. No. 42-1, at ¶¶ 10-13.

3

profanities, and throwing his arms up in the air.[24]  Fearing for his own safety and the safety of others in the vicinity, Deputy Johnson fired one shot from a distance of approximately five to ten feet.[25]  The bullet struck Clayton in the middle of his chest, stopped him in his tracks, and killed him.[26]

Matt Fiske, a Livingston Parish sheriff's department officer, arrived on the scene within 30 seconds of the moment that "shots fired" was announced over the radio.[27]  The dashboard video camera on Deputy Fiske's unit shows that he pulled into Burke's driveway and drove past her house towards the back of the property where Deputy Johnson was parked by the trailer.[28]  As Deputy Fiske's unit approached the trailer, the video shows Deputy Johnson circling around Clayton's body, gun drawn, possibly kicking an object away from Clayton, and placing Clayton in handcuffs.[29]  Deputy Fiske can be heard asking Deputy Johnson, "where's the weapon?"  Deputy Johnson responds, "Right there," pointing to an object on the ground near Clayton's body, which defendants contend was a knife.[30]  Deputy Fiske can then be observed securing the crime scene and summoning medical help.[31]

The only two surviving witnesses to the actual shooting are Burke and Deputy Johnson.  Both gave detailed recorded statements concerning the shooting shortly after the incident.  On

---

[24] R. Doc. No. 53-6, at ¶¶ 16-17; R. Doc. No. 88-1, pp. 93-95; R. Doc. No. 42-1, at ¶¶ 10-13.

[25] R. Doc. No. 42-9, ¶ 18; R. Doc. No. 42, Exhibit C-1, at 3:25-35; R. Doc. No. 53-8, at 12:00-12:15.  Deputy Johnson attests that he immediately announced "shots fired" over the radio after he discharged his weapon.  R. Doc. No. 42-9, at ¶ 19.

[26] R. Doc. No. 88-1, p. 95.

[27] R. Doc. No. 42, Exhibit A-1 at 4:00-5:30.

[28] *Id.*

[29] *Id.*

[30] *Id.*

[31] *Id.*

Case 3:11-cv-00845-LMA-DEK   Document 90   11/16/12   Page 4 of 39

April 4, 2011, approximately one hour after the shooting, Burke gave the following statement, in relevant part, to police officers:[32]

> Burke: At 7:00 in the morning, I witnessed my brother on their back porch beating Krystyna.
>
> Question: Ok. Now you're saying your brother. Could you say his name?
>
> Burke: His name is Jonathan Clayton.
>
> Question: Ok.
>
> Burke: I saw him beating her.
>
> Question: You call her "Krystyna." What's her last name?
>
> Burke: I'm sorry, Krystyna Westmoreland. I saw him hitting her on the porch and throwing her around. I came in, called 9-1-1, and then made her—Krystyna—come into my house until the police got here. When the police did get here, Jonathan would not cooperate.
>
> Question: Ok. Let's back up just a minute. Was she injured when she got here?
>
> Burke: She was bleeding profusely out of her head.
>
> Question: Ok. So she comes in. You lock the door. Where is he at, at that time?
>
> Burke: He's back there at the trailer.
>
> Question: Did he ever come up here?
>
> Burke: He came up here with a knife.
>
> Question: About how long was the knife? How big was the knife?
>
> Burke: The blade of it was probably 7 inches long. It looked like a filet knife. A long filet knife.
>
> Question: Ok. What was he saying?

---

[32] R. Doc. No. 42, Exhibit C-1. The following recorded conversations were loosely transcribed by the Court directly from the recordings submitted in connection with this motion. The transcriptions liberally omit "ands," "uhs," and other non-communicative and/or immaterial words heard on the recordings.

Case 3:11-cv-00845-LMA-DEK   Document 90   11/16/12   Page 5 of 39

Burke: He didn't say anything. He was just walking up here with it.

Question: Ok. What got your attention? You told us earlier it was the dog barking on the back porch, correct?

Burke: Yes.

Question: So when you're watching him come here you're on your back porch or looking out the window?

Burke: I'm looking out. Because my backdoor has full glass. The whole door. So I'm watching him in case he does come up and I have to defend myself.

Question: Ok. Alright. So he's coming up here and he turns around?

Burke: He turns around I guess because he heard all the sirens coming in the background. He went back to the trailer and I saw him stabbing her tires with the knife he had been holding. And then the police came in. I told the police where to go. Back there in the back. The police tried to, you know, get him to surrender. Get down on his belly or whatever. First, he tried to get him out the house. Then, when he came out the house, then he was trying to tell him to "get down, get down."

Question: When your brother came out of the house what did he have in his hands, anything?

Burke: I don't know.

Question: Could you see anything?

Burke: I didn't see anything.

Question: Ok. Was your brother saying anything?

Burke: But he was walking real ugly-like, scary-like, towards the cop, screaming, "Shoot me! Shoot me!" and calling the police officer names and stuff like that.

Question: What was he calling him?

Burke: "Pussy." Because he wouldn't shoot him, and stuff like that.

Question: Ok. Then what happened?

6

Burke:  Jonathan kept coming.  He got within about 5 feet or so of the police and he shot him.

Question:  Can you tell me anything you heard the deputy say?  I know you said he was telling him things.  Can you tell anything specifically what he said?  What he was telling Jonathan?

Burke:  Well, first, he was telling him to "get out of the house. Come out of the house."

Question:  Ok.  And then what.

Burke:  To "get on the ground."  Was telling him to "stop.  Stop where you're at."  And he wouldn't stop.  He just kept walking towards him.

Question:  Aggressively walking?

Burke:  Aggressively walking towards him.

Question:  Ok.

Burke:  Screaming. Hollering.  Throwing his hands up in the air.

Question:  Ok.  Did you ever see anything in his hands?

Burke:  Not at that time.

Question:  Ok.

Burke:  I saw that knife earlier.

Question:  Ok.  I understand your brother has had some emotional problems in the past?

Burke:  Yes.  Emotional and he's a drug addict.

Question:  Ok.  What kind of drugs?

Burke:  Anything to shoot up in your vein.  Heroin.  Morphine.  I don't know what he does.  I don't know.

Question:  You said he's been in a mental institution before, huh?

Burke:  Several times.

Question:  Several times?  When's the last time?

Burke:  About a month ago.

Question: Ok. How long has he and Krystyna been together?

Burke: This time probably about four months. They had been together before a few years ago.

Question: Ok. Was it a violent relationship then? Or do you know?

Burke: He's never hit a female until this date that I know of.

Question: Ok.

Burke: But, as far as arguing, yea. But he's never hit a female before.

Question: Are you scared of him?

Burke: I've always been scared of him. I'm deathly afraid of him.

Question: Why?

Burke: Because I'm scared he's going to hurt me or my kids.

Question: Ok.

Burke: When he walks up to my house I watch his hands and everything—to make sure he's not—and pockets and everything. I've been living in fear for years.

Question: Has he ever hurt you?

Burke: No. He's never hurt me.

Question: Has he ever threatened you?

Burke: No. He's mentally unstable though and you know it. You know what I mean? He has hurt other people, though. Just not me. I'm his sister. He hasn't crossed that line. He hasn't ever hurt me or my mom.

Question: Your mom is who actually lives in that trailer? That's her trailer?

Burke: Yes, ma'am. She's in Colorado on vacation.

Question: Has he ever hurt her?

8

Burke: No. But he hurt her boyfriend. He threw a big rock ashtray and it— pow!—hit him in the face, knocked his teeth out. He's been in and out of jail.

Question: So he has a volatile personality.

Burke: He got put in jail for cutting somebody in Baton Rouge before. I mean, I have reason to be scared of the guy. Even though it was never towards me --

Question: Has he ever attempted suicide before?

Burke: Yes, ma'am.

Question: How did he do that?

Burke: He ran out in front of a cop coming down the road one time. He's OD'd and had to go to the hospital on drugs. He's a cutter.

Question: You talking about cutting himself, right?

Burke: Yes. He's crazy, you know what I mean? He does weird things and acts strange that made me fear him.

Question: Ok. Can you give us an example of that? What makes you uncomfortable?

Burke: Well first of all, he's into all of this devil worshipping kind of music. And he gets this evil look in his eyes. He talks this crazy nonsense, you know, listens to sick twisted music. And like I said, he's gotten in several altercations with different people and hurt them.

Question: Does he work?

Burke: Well he just got suspended from work like two days ago.

Question: Where was he working at?

Burke: Baton Rouge Country Club. Dishwashing. They pulled up his background and saw where—he hadn't been convicted of it yet—but he's charged with this big heroin thing in Baton Rouge. So they put him on suspension.

Question: Alright. Is there anything else we need to know about the incident? Did she say anything to you when she got up here?

Case 3:11-cv-00845-LMA-DEK   Document 90   11/16/12   Page 9 of 39

Burke: She was just scared he was going to come up here and kill her.

Question: Did she say anything what started this or anything?

Burke: She said he wouldn't let her have her car.

Question: So she was wanting to leave? So she was trying to leave when he—

Burke: Beat her.

Question: Ok. Did she say why she was wanting to leave?

Burke: I think she said that they were arguing because she's supposed to get some money from her mom today and Jonathan wanted to spend it on drugs and she didn't. That's what started the fight.

Question: Ok. What else did she say?

Burke: That's really about it. "I'm dying. I think I'm going to die. Please don't let him come up here. He's going to kill me. He's going to kill me." I just kept making her sit on the couch, sit on the couch.

Question: Ok. You saw him hit her?

Burke: Oh yea.

Question: And she said she thought he was going to kill her?

Burke: Yea.

On April 14, 2011, ten days after the shooting, Deputy Johnson gave his own account of

the incident in the following statement to police officers:[33]

Deputy Johnson: I'm sitting on a perimeter off of Sunset Lane. Off of Walker South Road. I was back in the cul-de-sac just standing outside the vehicle just waiting for, I guess, to [inaudible] the perimeter or not. I heard a domestic disturbance come in. My supervisor Warren Saxton told me—or actually told dispatch to give it to me—so she called me, told me I need to get you en route over there. Apparently there was a male that hit a female with a pipe and weapons, possibly still on the scene.

---

[33] R. Doc. No. 53-8.

10

So I headed that way, was trying to get information over the radio—Is he still there? Suspect still there? Description?—and they said he had a prior warrant or he had a warrant. I bumped it up to Code 2 trying to get on over there. They said he was still on the scene and now there's a knife and he done cut the tires beat the windshield out and windows out the car.

Question: Let me stop you for a minute. Why don't you clarify on the tape what's the difference between Code 1, Code 2, and Code 3 here at the Livingston Parish sheriff's department.

Deputy Johnson: Code 1 is just normal travel. Code 2 is lights and siren when needed, through intersections what have you. Code 3 is lights and sirens steady. Being as the suspect was still on the scene, I bumped it up to Code 2—lights siren only when needed—just to get a little—cause I was a little ways out—I was at Walker South Road and it was way up north on North Corbin Avenue, north of Walker.

So I'm heading down to North Corbin avenue en route. I cut the lights and sirens and everything off. You know, I didn't want to spook the guy or anything like that. I end up passing the house up. Seen the fire department in the driveway. I just assumed that's where they was. I come to find out they were staging.

So I put it in reverse. I seen a woman flag me down. I pulled into a drive. There's a woman wearing a bathrobe. I'm not sure what the color was. I asked if I was at the right spot. I seen the mailbox. Wasn't sure it was the residence because there was a trailer out back and a house in the front. I was going about the residence where I was called to. 3-0-600 or something like that.

So I pulled in the drive. Started talking to her, "Who is he?" "Where's he at?" I seen a gentlemen in the back trailer with his head and shoulder out the door, just looking. She said, "Yea that's my brother down there. He needs to go to jail. He just beat his wife," what have you. I just shut the door. Quit talking to her. Didn't say anymore. Just headed down the driveway.

Soon as I pulled up behind the car I noticed it was all damaged, back window busted out. I got out. Draw my gun. He jumps back inside and shuts the door. I hear the tires deflate. Apparently, he had just got finished slicing the tires. I get up there to the door. I was at a fast pace—trying—I seen him go in. I'm trying to get inside. Try to take control of the situation. The door's locked. "Hey you need to come out, you need to come outside now."

11

Question: Let me ask you a question.

Deputy Johnson: Yes, sir.

Question: When you pulled up to the woman in the front, did you ever see the girl that had been beaten?

Deputy Johnson: I didn't. I didn't see her until after the incident.

Question: Ok. Alright. Continue on. You're at the front door?

Deputy Johnson: I was at the front door, beating on the door. He won't come out. I seen him poke his head out. I had the gun right there at the front door. He backs off says, "Hey I'm gonna shoot you." So at that time I said, "Crap, he's got a gun." So I started backing up a little bit off the porch.

He said, "Get back you motherfucker. I'm gonna shoot you. Get back you motherfucker. I'm telling you right now I'm crazy."

So I'm backing up off the porch, "Hey, you need to come outside, come outside," before he opens up the front door. And he has his hand—his right hand—behind his back the whole time. And I'm like, "Hey, put the gun down, put the gun down." Telling Livingston the whole time over the radio that he's possibly got a gun or what have you. I don't know the exact words.

So he comes out the front door, starts walking down the steps while I'm backing up the whole time. "I don't want to shoot you, I don't want to shoot you." I said, "Put the gun down. Put the gun down."

"You fucking pussy. You want to shoot me? I'm crazy motherfucker. Shoot me."

I said, "I don't want to shoot you. I don't want to shoot you."

"I want the police to shoot me motherfucker."

And I said, "man, you better put the gun down."

Well then he kind of turned a little bit and I seen a blade sticking out. He don't have a gun. "Livingston, he's got a knife."

So he goes back up the steps. Goes back in the house. I've still got my gun on him. I follow him back up the steps a little bit.

12

And he says, "Yea, you're doing this to me."

And I said, "I ain't doing nothing to you. You know you got your kids."

"I ain't got no fucking kids."

I said, "Well I got kids. Let's try to control this. Put the knife down."

"You want to see what you're doing to me?" And he gets the knife and starts cutting on his arm.

And I said, "Hey. That's you man. That's not me. You don't need to be doing that." I said "we got Acadian up there," and what have you.

He said, "You see what you're doing?" And he grabs the knife and pulls it across his throat with his right hand. It bleeds a little bit. Apparently it was a dull knife or whatever.

He comes back out the door. "As soon as you come back out, I'll back down off the porch, man. Put the knife down. Put the knife down." He still has it up in his left hand sitting there coming at me. I said, "Man, put the knife down."

"Shoot me motherfucking pussy. You a pussy ain't you. Fucking shoot me. I want the cops to kill me."

"Livingston," I said. "He wants to be killed by a cop."

[inaudible]

I'm sitting there saying, hey. I mean my legs were shaking. I'm scared half to death. He's got this knife coming at me. I don't want to shoot him. I tell him, "Hey, put the knife down" one more time. He said, "Fuck you motherfucker." He starts walking a little faster to me and that's when I took a shot off. Thought to myself, "Crap."

I looked around. I seen Matt Fiske driving into the driveway. Had to get back to my senses. What's going on. I kicked the knife out. Disarmed him. Put him in 'cuffs. And that was it.

13

After that Matt Fiske came up: "Hey, I'm taking control," or whatever. Well I go get my CSI kit out that we just went to school for.

"No, you can't do this crime scene. This ain't got nothing to do with you no more."

"Ok, yea." I'm just thinking they're trying to do the crime scene.

Question: Well I'm sure there's a lot going through your head at that time. He was inside the house and inside the trailer and then he was outside on the porch, correct?

Deputy Johnson: That happened twice.

Question: Yea. As he would do that you would back down off the porch?

Deputy Johnson: Correct.

Question: So you were back on the ground itself?

Deputy Johnson: Correct.

Question: Where in that process did he actually cut his throat and what was the distance?

Deputy Johnson: He cut his throat behind the screen door inside the house.

Question: Inside the trailer?

Deputy Johnson: Looking at me from the outside or from the inside out.

Question: Ok. And you were on the porch at that time, correct?

Deputy Johnson: I was on the steps.

Question: What kind of distance are we talking, like approximate footage. 10 foot, maybe? 5 foot?

Deputy Johnson: I guess . . . 10 maybe. I don't know how far it is from the edge of the steps to the front door.

Question: But you were in close proximity with the subject, correct?

Deputy Johnson: Yes.

Question: Pretty much the entire time?

Deputy Johnson: Yep.

Question: Ok. As he comes out that trailer towards you, you're off the porch?

Deputy Johnson: Correct.

Question: He exits off the porch. About how close are y'all then. Same thing? About 5-10 foot? You're in close proximity?

Deputy Johnson: Same distance the whole time.

Question: Ok. So as you're backing up he's coming toward you with that knife.

Deputy Johnson: I just drew a line that he wasn't going to get past my car because I knew the female was back behind me. And if we got in the open area, or whatever, then anything could go.

Question: You weren't actually protecting yourself. You were actually protecting anybody else who was on that property?

Deputy Johnson: Correct. Because I knew the woman was back there behind me. I didn't actually see her, but I heard somebody back there talking to somebody while I'm trying to focus on him.

Question: And the knife's in what hand? Which hand?

Deputy Johnson: Left hand.

Question: Left hand? Ok.

Deputy Johnson: When he went down he hit his chest with it. And when he laid down he laid on the side. I kicked the knife out his left hand. He cut with his left hand also. I think he cut with his right hand when he cut across his neck.

Question: Ok. So he switched hands?

Deputy Johnson: Correct.

15

Question:  To clarify—you only fired your duty weapon once, correct?

Deputy Johnson:  Correct.

* * *

Question:  I know earlier you stated that you feared for your life and for the others on the property.  So you felt when he came towards you that you were going to sustain either great bodily harm or you could be killed due to his actions, correct?

Deputy Johnson:  Oh yea.

Question:  You felt that he was willing to use that knife against you?

Deputy Johnson:  Yea.  He already said he was suicidal.  He told me he was suicidal.  And he wanted me to shoot him.  And if he didn't want me to shoot him, he wanted me to come at him.  One way or another.

Question:  Right.  And as you being a commissioned officer it's your job not only to protect your life but others lives as well, correct?

Deputy Johnson:  That's correct.

Question:  And you feared for those people that had already been injured or on that property.

Deputy Johnson:  I did.  I heard it was pretty bad.  I assumed that he still had the pipe.  That's the way I was there until I seen the knife.  And when he told me he was going to shoot me I thought he had a gun at that time.

Question:  So you didn't know what kind of weapon he had until you visually saw him?

Deputy Johnson:  Correct.  There was three that was presented, but I only seen one.

Question:  Until you saw the knife in his hand?

Deputy Johnson:  Correct.  The knife is the only thing I ever seen. I never seen the pipe that he used on the victims.

* * *

16

Question: David, did you have anything that you want to add or take away from this statement?

Deputy Johnson: I wished everything could have been different.

Question: You've been on the job five years full time, correct?

Deputy Johnson: Correct.

Question: You've had a lot of different situations that you've been involved in, correct?

Deputy Johnson: This is my second officer involved shooting incident.

Question: Were you the officer that actually shot the last time.

Deputy Johnson: Negative.

Question: You were just at that location?

Deputy Johnson: I was standing right next to him.

Question: When it occurred?

Deputy Johnson: In front of the suspect.

Question: Ok. But you've come through a lot in five years. You deal with a lot?

Deputy Johnson: Correct.

Question: Alright. And in this one instance, you definitely felt that your life and everybody else's life was in danger?

Deputy Johnson: I did.

Question: So you did what you had to do to protect yourself and others?

Deputy Johnson: I believe I did.

Question: Under the umbrella of your commission, correct?

Deputy Johnson: Yes, sir.

Question: As a deputy of the Livingston Parish sheriff's office, correct?

Deputy Johnson: Yes, sir.

The statements of Burke and Deputy Johnson are largely consistent with their testimony made in response to formal discovery. Burke testified, in relevant part, during her deposition on May 10, 2012, as follows:[34]

> Question: Okay. Did your brother, when your brother first came out, when the deputy arrived, did you ever see your brother go back into --
>
> Burke: He never went in once he came out.
>
> Question: Okay. And then what happened after that? The officer – your brother comes off the porch; what happens next?
>
> Burke: He rounds the banister, and the officer is telling him to get on – hollering at him to get on the ground. Get on the ground, get on the ground, get on the ground.
>
> Question: Was your brother complying?
>
> Burke: No.
>
> Question: Did your brother approach the officer in a threatening manner?
>
> Burke: He was walking towards him.
>
> Question: Was he flailing his arms around as--
>
> Burke: He was hollering, and his arms were going up in the air every time he hollered.
>
> Question: All right.
>
> Burke: Like any coon-ass hollers.
>
> Question: It's fair to say that he was not obeying the officer's commands, correct?
>
> Burke: Right.
>
> Question: And he was approaching him in a threatening manner, correct?
>
> Burke: He was holler - -- yes. He was hollering at him.

---

[34] R. Doc. No. 88-1, pp. 93-103.

Question:  Approaching him in a threatening manner, correct?

Counsel:  Let me object.  It's asked and answered, and it's argumentative.

Burke:  I just said he was hollering at him.

* * *

Question:  All right.  So what happens next?  Your brother is yelling at the officer;  do you remember what he's yelling at him?

Burke:  To shoot him.

Question:  All right.  And he's flailing his arms?

Burke:  Uh-huh.

Question:  Yes?

Burke:  Yes.

Question:  And what happens next?

Burke:  The cop shot him in the heart.  He was in mid-step.

* * *

Question:  Did you ever see a knife in the area?

Burke:  Never.

Question:  Never saw a knife in close proximity to where your brother fell when he was shot; is that your testimony?

Burke:  That's my testimony.

Question:  Do you know if a knife was found in close proximity to where your brother was shot?

Burke:  I know that they're saying that there was a knife there.

Question:  Right.

Burke:  That's what they're saying.

Question:  Right.  What's your position on that?

Burke:  My position is there was no knife there.

19

Question: Because if there was one, you would have seen it?

Burke: I would have seen it in his hand. There was plenty time for me, with him flailing his arms, to see the giant knife in his hand.

Question: And even after the shooting, shortly after the shooting, you were watching, and if there was a knife in close proximity to where your brother fell, you would have seen that as well, correct?

Burke: That's right.

* * *

Question: And you listened to [your] statement before your deposition today, right?

Burke: I did.

Question: And everything in that statement that you said is true and accurate?

Burke: To the best of my knowledge that day, yea. I was pretty shook up. But it was pretty – pretty much it.

On September 18, 2012, Deputy Johnson testified during his deposition that, consistent with his previous statement, Clayton was approaching him in a threatening manner while holding a knife.[35] Deputy Johnson testified, in relevant part, as follows:

We talked, you know, both hollering and screaming back and forth. I said, "You don't need to do this." Well, he comes on out the door. He starts in an aggressive manner, you know, just really fast coming at me. I said, "Man, you need to stop. Lay the weapon down. Lay the weapon down." He has got the knife up in his hand and he is coming at me. He said, "I am going to make you shoot me you fucking pussy. Shoot me motherfucker. You are going to shoot me you pussy." I said, "I don't want to shoot you. I don't want to shoot you. Let's do this. Let's get out of this right now. He said, "I am going to make you fucking shoot me." He come up with the knife, and that's when I shot him.

---

[35] R. Doc. No. 87, p. 52.

Case 3:11-cv-00845-LMA-DEK   Document 90   11/16/12   Page 20 of 39

On May 10, 2012, Westmoreland testified during her deposition that she did not see the actual shooting, but that she observed at least part of the confrontation between Deputy Johnson and Clayton.[36]  Westmoreland testified, in relevant part, as follows:

> Question:  Did you -- were you able to hear the police officer and/or Jonathan engaging in any communication --
>
> Westmoreland:  Yes, sir.
>
> Question:  Tell me what you were --
>
> Westmoreland:  The officer yelling at him to stop and things like that.  And Angela at one point in time told him, "Jonathan, stop."  Then there was a period of silence.  And then the yelling started again and then there was the gunshot.  I was not able to see the gun shot.  I was -- I don't remember if I was in the house or in the front of the house when that happened.
>
> Question:  Okay.  Are you able to estimate for me about how long a period of time elapsed from when the officer first arrived on scene until the shooting occurred?
>
> Westmoreland:  I would think about ten, fifteen minutes.
>
> Question:  So it was a matter of minutes, it wasn't immediately?
>
> Westmoreland:  No, it was not immediately.
>
> Question:  Okay.  But you were sitting at the front of the house, so you weren't able to really see what was going on a lot between the officer --
>
> Westmoreland: No, sir.  I believe I saw, at one point in time -- I don't remember if I was in the house or if I came around -- I think I came around to kind of where the police officer had originally stopped, and looked down the driveway, and I saw Jonathan walking towards the officer and throwing his hands out, yelling at the officer, and the officer had his gun drawn and was telling Jonathan to stop.  But then I walked back around to the front of the house.
>
> Question:  Okay.  At that point in time were you able to tell if Jonathan had anything in his hands?

---

[36] R. Doc. No. 88-2, pp. 36-41.

Westmoreland:  I didn't see anything in his hands.

Question:  Is it possible he did and you just didn't see it, or you're telling me he definitely didn't have anything in there?

Westmoreland:  I'm pretty sure he didn't have anything in his hands at that point in time.

Question:  Okay.  And then you went back into the house?

Westmoreland:  I went back around to the front of the house, because the paramedics were trying to treat me and I kept getting up and moving around.

Question:  Now, when you first saw Jonathan, were the first responders to you yet?

Westmoreland:  Yes, sir, they were to me, and they were trying to get me to sit down and be still, and I kept moving around and freaking out.

Question:  Okay.  And when you saw Jonathan when you peeked around the house, were you located about where you've drawn that X on Exhibit 11?

Westmoreland:  Around that area, yes, sir.

Question:  And where was Jonathan?

Westmoreland:  He was coming around from his house.  He was at the end, kind of in the gravel part of the driveway, I believe, walking, and the officer was backing up, kind of – like, the driveway was like this, and he kind of was backing up this way with his gun drawn, telling him to stop.

Question:  Okay.  Where was Jonathan in relation to the trailer when you first saw him?

Westmoreland:  He wasn't on the porch of the trailer, he was kind of like in the driveway part that's in front of the trailer.  He was kind of walking that direction, like towards the bushes and things that are growing on the side.

Question:  He was near -- he was near the porch when you saw him?

Westmoreland:  He wasn't near the porch anymore.  He had come off the porch and he was kind of walking like in the driveway, kind of, like, I guess catty-corner, would be the word.

22

* * *

Question: Okay. And what was the officer doing?

Westmoreland: He had his gun drawn and he was backing away from Jonathan and telling Jonathan to stop.

Question: Which direction was he backing up?

Westmoreland: The right -- he was backing away on the right. Jonathan was walking in, like, the right direction, and the officer was backing away from him. I don't know what direction it is, I don't --

Question: If you don't know, that's fine. I'm just, I'm wondering if he was backing up towards the house --

Westmoreland: He was backing up towards the bushes. Jonathan was coming this way, and the officer was backing up towards the bushes.

Question: All right. And then you went back to resume getting treatment?

Westmoreland: Yes, sir.

Question: And then, how many minutes was it, you think, after that that the shooting happened?

Westmoreland: I really don't know. I guess maybe five minutes. Around five minutes or so.

Question: Again, it wasn't instantaneous, some --

Westmoreland: No, sir. Some time had passed.

Question: After you -- we just got through a discussion when you peeked down there and you drew on Exhibit 12 where you saw them. You never looked down there again, correct?

Westmoreland: No, sir. I sat down and was treated.

Question: Did you hear anything else between Jonathan and the officer though, while you were being treated?

Westmoreland: I heard the "stop," and I believe I heard him telling him to lay down. And then there was silence, there was a period of silence where everybody quit yelling, and then I don't remember if I heard the officer yell first or if I heard Angela yell

23

first, somebody yelled, "Jonathan, stop." And probably less than a minute after that there was gunfire.

Question: Okay. Did you see Angela – do you know where Angela was when the gun was fired?

Westmoreland: I believe she was around in the driveway to the side of her house.

Question: Did you see her?

Westmoreland: No, sir. She was out of my eyesight at that point in time.

On September 25, 2012, Deputy Johnson filed his motion for summary judgment with respect to all federal and state claims asserted against him. Deputy Johnson contends that Burke's testimony is inconsistent and cannot overcome the evidence showing that Clayton had a knife when he was shot. Deputy Johnson contends that his testimony, combined with the dashboard recording captured from Deputy Fiske's unit, show that Clayton was holding a knife when he was shot, and that Deputy Johnson can be seen kicking it away from Clayton's body before placing him in handcuffs. Deputy Johnson also contends that his decision to use deadly force would have been reasonable under the circumstances even if Clayton did not have a knife when he was shot. Deputy Johnson contends that a reasonable officer in his position would have reason to believe that Clayton posed a serious threat to himself and others even if he was unarmed at the moment Deputy Johnson pulled the trigger. Finally, Deputy Johnson argues that there is no evidence supporting any claims premised on a failure to provide adequate or timely medical attention.

Sheriff Graves also filed a motion for summary judgment with respect to all federal and state claims asserted against him in his individual and official capacities. Sheriff Graves contends that any claims against him are rendered moot if the motion for summary judgment is granted in favor of Deputy Johnson. Sheriff Graves contends that even if that motion is denied,

24

plaintiffs have failed to come forward with evidence supporting their claims premised on inadequate hiring and/or screening. Sheriff Graves further contends that plaintiffs have failed to come forward with evidence sufficient to establish liability against him based on a theory of a failure to train or supervise.

On October 5, 2012, plaintiffs filed their opposition to Deputy Johnson's motion arguing that disputed issues of material fact preclude summary judgment. First, plaintiffs contend that Deputy Johnson, from the moment he arrived on the scene, acted recklessly by failing to call the Sheriff's Special Response Team ("SRT") to handle the situation. Second, plaintiffs argue that genuine issues of material fact exist with respect to whether Clayton was holding a knife when he was killed, and whether a knife was planted on the scene after the shooting. Plaintiffs contend that Deputy Fiske's dashboard camera recording does not show that Deputy Johnson immediately kicked a knife out of Clayton's hand after shooting him, but rather that no object can be seen flying, skidding, or moving away from Clayton's body after the kicking motions were made. Plaintiffs also note that Deputy Johnson can be seen in the area where the knife was located before making any kicking motions. Plaintiffs contend that their testimony that Clayton was not holding a knife when he was shot is neither inconsistent, nor capable of being disregarded, in light of the video recording. Finally, plaintiffs contend that, without a knife, Clayton did not pose a serious threat of harm to Deputy Johnson or others such that deadly force could be used to seize him.

Plaintiffs also oppose Sheriff Graves's motion for summary judgment. Plaintiffs contend that Clayton's death was the result of Sheriff Graves's deliberate indifference with respect to the training or supervision of Deputy Johnson. Plaintiffs contend that Deputy Johnson was not trained to adhere to police procedures requiring the SRT to handle situations involving individuals threatening suicide while armed. Plaintiffs further contend that Deputy Johnson was

not reprimanded as a result of another incident (which is still pending) in which another patrol deputy disregarded such procedures and tactically engaged a man threatening suicide while armed. Plaintiffs contend that Sheriff Graves was deliberately indifferent with respect to the need to train and equip Deputy Johnson with less-than-lethal methods of restraint and the handling of situations involving suicidal suspects. Finally, plaintiffs contend that Sheriff Graves ratified Deputy Johnson's conduct by failing to consider the possibility that Deputy Johnson lied about the circumstances of the shooting.

### STANDARD OF LAW

Summary judgment is proper when, after reviewing "the pleadings, the discovery and disclosure materials on file, and any affidavits," the court determines there is no genuine issue of material fact. Fed. R. Civ. P. 56(c). The party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The party seeking summary judgment need not produce evidence negating the existence of material fact, but need only point out the absence of evidence supporting the other party's case. *Celotex*, 477 U.S. at 323; *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1195 (5th Cir. 1986).

Once the party seeking summary judgment carries its burden pursuant to Rule 56(c), the other party must come forward with specific facts showing that there is a genuine issue of material fact for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The showing of a genuine issue is not satisfied by creating "'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations omitted). Instead, a genuine issue of material fact exists when the "evidence is such that a

26

reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party responding to the motion for summary judgment may not rest upon the pleadings, but must identify specific facts that establish a genuine issue. *Id.* The nonmoving party's evidence, however, "is to be believed, and all justifiable inferences are to be drawn in [the nonmoving party's] favor." *Id.* at 255; *see Hunt v. Cromartie*, 526 U.S. 541, 552 (1999) (internal quotation and citation omitted) (alteration in original).

## *DISCUSSION*

### I. Excessive Force Claims

#### A. Primary Issue

The primary issue raised in this motion for summary judgment is whether Deputy Johnson would be entitled to qualified immunity even if Clayton was not holding a knife when Deputy Johnson pulled the trigger. The parties vigorously dispute whether Clayton was, in fact, still holding a knife when he was shot, and the Court agrees with plaintiffs that this fact is genuinely in dispute. Deputy Johnson's testimony that Clayton was coming at him with a knife conflicts with Burke's testimony with respect to that issue. Plaintiffs' version of the facts is neither "absurd" nor "plainly contradicted" by the video captured by Deputy Fiske's dashboard camera such that Burke's testimony may be disregarded for purposes of summary judgment. *Poole v. City of Shreveport*, 691 F.3d 624, 630-32 (5th Cir. 2012)   (citing *Scott v. Harris*, 550 U.S. 372, 381, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007)). At this juncture, the Court must view the evidence in a light most favorable to plaintiffs by assuming that Clayton was not holding a knife for the purposes of this motion.

#### B. Qualified Immunity

In *Harlow v. Fitzgerald*, the United States Supreme Court established the principle that "government officials performing discretionary functions generally are shielded from liability for

civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396 (1982). A claim of qualified immunity requires the Court to engage in the well-established two-step analysis developed by the Supreme Court in *Saucier v. Katz*, 533 U.S. 194, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001), *overruled in part by Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009). *See Lytle v. Bexar County, Tex.*, 560 F.3d 404, 409-10 (5th Cir. 2009). As stated by the Fifth Circuit in the context of a motion for summary judgment:

> First, we determine whether, viewing the summary judgment evidence in the light most favorable to the plaintiff, the defendant violated the plaintiff's constitutional rights. *See, e.g.*, *Tarver v. City of Edna*, 410 F.3d 745, 750 (5th Cir. 2005); *McClendon v. City of Columbia*, 305 F.3d 314, 322-23 (5th Cir. 2002) (en banc); *Glenn v. City of Tyler*, 242 F.3d 307, 312 (5th Cir. 2001). If not, our analysis ends. If so, we next consider whether the defendant's actions were objectively unreasonable in light of clearly established law at the time of the conduct in question. *See, e.g.*, *Tarver*, 410 F.3d at 750; *Glenn*, 242 F.3d at 312. To make this determination, the court applies an objective standard based on the viewpoint of a reasonable official in light of the information then available to the defendant and the law that was clearly established at the time of the defendant's actions. *See Glenn*, 242 F.3d at 312; *Goodson v. City of Corpus Christi*, 202 F.3d 730, 736 (5th Cir. 2000); *see also Tarver*, 410 F.3d at 750 ("If officers of reasonable competence could disagree as to whether the plaintiff's rights were violated, the officer's qualified immunity remains intact.").

*Freeman v. Gore*, 483 F.3d 404, 410-11 (5th Cir. 2007).

The Court must "make two 'overlapping objective reasonableness inquiries' " when conducting the qualified immunity analysis in excessive force cases. *Sanchez v. Fraley*, No. 09-50821, 2010 WL 1752123, at *2, (5th Cir. Apr. 30, 2010) (unpublished) (quoting *Lytle*, 560 F.3d at 410). As stated by the Fifth Circuit,

> Allegations that an officer used excessive force in conducting a seizure complicates the *Saucier* inquiry. This complexity stems

from having to make two "overlapping objective reasonableness inquir[ies]." *Id.* at 210, 121 S. Ct. 2151 (Ginsburg, J., concurring in the judgment). We must first answer the constitutional violation question by determining whether the officer's conduct met the Fourth Amendment's reasonableness requirement, as discussed below. If we find that the officer's conduct was not reasonable under the Fourth Amendment, we must then answer the qualified immunity question by determining whether the law was sufficiently clear that a reasonable officer would have known that his conduct violated the constitution. In other words, at this second step, we must ask the somewhat convoluted question of whether the law lacked such clarity that it would be reasonable for an officer to erroneously believe that his conduct was reasonable. Despite any seeming similarity between these two questions, they are distinct inquiries under *Saucier,* and we must conduct them both.

*Lytle*, 560 F.3d at 410.

When a defendant invokes qualified immunity, the burden is on the plaintiff to demonstrate the inapplicability of the defense. *See McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002) (en banc) (citing *Bazan ex rel. Bazan v. Hidalgo Cnty*, 246 F.3d 481, 489 (5th Cir. 2001)). When faced with a motion for summary judgment, "the plaintiff can no longer rest on the pleadings . . . and the court looks to the evidence before it (in the light most favorable to the plaintiff) when conducting the *Harlow* inquiry." *McClendon*, 305 F.3d at 323 (quoting *Behrens v. Pelletier*, 516 U.S. 299, 309, 116 S. Ct. 834, 133 L. Ed. 2d 773 (1996)) (omission in original). While viewing all facts in a light most favorable to plaintiffs, the burden remains on plaintiffs "to negate the [qualified immunity] defense once properly raised." *Poole*, 691 F.3d at 627 (quoting *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008)). Even on summary judgment, this Court cannot ignore that qualified immunity "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Poole*, 691 F.3d at 627 (quoting *Brumfield*, 551 F.3d at 326).

### C. Whether Deputy Johnson's Conduct Violated the Fourth Amendment

The Court must first determine whether Deputy Johnson's conduct violated the Fourth Amendment which guarantees citizens the right to be free from unreasonable searches and seizures. U.S. Const. Amend. IV. To state an excessive force claim, the plaintiff must establish that he suffered "(1) an injury that (2) resulted directly and only from the use of force that was excessive to the need and that (3) the force used was objectively unreasonable." *Ballard v. Burton*, 444 F.3d 391, 402 (5th Cir. 2006) (citing *Flores v. City of Palacios*, 381 F.3d 391, 396 (5th Cir. 2004)). "Assessing the reasonableness of a police officer's use of force involves 'a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.' " *Lytle*, 560 F.3d at 411 (quoting *Graham,* 490 U.S. at 396) (internal quotation omitted). Some of the factors the Court considers are "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Deville v. Marcantel,* 567 F.3d 156, 167 (5th Cir. 2009) (quoting *Graham*, 490 U.S. at 396). "[W]e must balance the amount of force used against the need for force," paying "careful attention to the facts and circumstances of each particular case." *Ramirez v. Knoulton*, 542 F.3d 124, 129 (5th Cir. 2008) (quoting *Flores*, 381 F.3d at 399) (internal quotation marks and citations omitted).

The Supreme Court has made clear that an officer's actions are judged under an objective standard that does not take into account an officer's subjective intent. *Graham,* 490 U.S. at 397. Government officers are also entitled to deference:

> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight . . . . The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation.

30

*Id.* at 397.  However, the "objective reasonableness" balancing test is "constrained" when an officer uses deadly force. *Sanchez*, 2010 WL 1752123, at *2 (quoting *Flores*, 381 F.3d at 399). Deadly force may only be used where "an officer would have reason to believe that the suspect poses a threat of serious harm to the officer or others." *Ramirez v. Knoulton*, 542 F.3d 124, 129 (5th Cir. 2008) (quoting *Mace v. City of Palestine*, 333 F.3d 621, 624 (5th Cir. 2003)).  The threat of harm must also be immediate.  *Reyes v. Bridgwater*, 2010 WL 271422, at *4 (5th Cir. Jan. 22, 2010) (citing *Garner*, 471 U.S. at 11) ("Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so . . . .  A police officer may not seize an unarmed, nondangerous suspect by shooting him dead."). "[T]he focus of the inquiry is 'the act that led the officer to discharge his weapon.'" *Reyes*, 2010 WL 271422, at *3 (quoting *Manis v. Lawson,* 585 F.3d 839, 845 (5th Cir. 2009) (alteration omitted)).

Turning to the undisputed facts of this case, it is clear that Deputy Johnson knew he was responding to a dangerous crime scene where the suspect was reported to have attacked a female with a weapon.  The 9-1-1 dispatcher advised Deputy Johnson that the suspect was still on the scene of an alleged battery in which a 20-year old female sustained injuries after a male hit her in the head with a pipe.[37] The 9-1-1 dispatcher also advised Deputy Johnson that the suspect's sister was threatening to shoot the suspect to defend herself.[38] When he arrived, Deputy Johnson could see that Clayton had recently broken the windows and slashed the tires of Westmoreland's vehicle.  When Deputy Johnson knocked on the door of the trailer and ordered Clayton to come

---

[37] R. Doc. No. 42, Exhibit B-1, at 6:00 – 7:00.

[38] *Id.* at 12:45.

out, Clayton threatened to shoot the officer,[39] and he refused to show his hands such that Deputy Johnson believed he had a gun.

The confrontation rapidly escalated to the point where Deputy Johnson clearly had reason to believe that Clayton did, in fact, pose a serious threat to the officer or others, even though he could see that Clayton did not have a gun. Deputy Johnson watched as Clayton became increasingly agitated and attempted to cut his own throat with a knife. Clayton then repeatedly refused to follow commands to come out of the trailer, stop walking towards the officer, and to get on the ground. Although Deputy Johnson did not know Clayton's mental health and criminal history at the time,[40] the objective facts indicated that he was being confronted by a suicidal and non-compliant suspect with dangerous and violent propensities that presented "a heightened possibility of threat to the officers or others." *Btesh v. City of Maitland, Fla*, No. 10-71, 2011 WL 3269647, at *20 (M.D. Fla. July 29, 2011) (quoting *Fernandez v. City of Cooper City,* 207 F. Supp. 2d 1371, 1378 (S.D. Fla. 2002)). The danger was enhanced by the facts that Deputy Johnson had drawn his service weapon and that he was in close proximity as Clayton continued to come towards him and ignore his commands. *Btesh*, 2011 WL 3269647, at *20.

The threat of Clayton approaching from a distance of approximately five to ten feet presented an immediate risk of serious harm to Deputy Johnson and others. Deputy Johnson did not pull the trigger until Clayton had backed him up to the open area between the trailer and the house where first responders were treating Westmoreland. Deputy Johnson testified that he could hear people talking behind him. Clayton was coming at Deputy Johnson, throwing his

---

[39] *Id.* at 18:55.

[40] The analysis turns on an "objective standard based on the viewpoint of a reasonable official in light of the information then available to the defendant." *See Freeman*, 483 F.3d at 410-11. To the extent that information unknown to Deputy Johnson has been presented in this order and reasons, it is intended only for purposes of general background information.

hands in the air, and yelling, "I am going to make you shoot me you fucking pussy. Shoot me motherfucker. You are going to shoot me you pussy." Clayton was not deterred by the fact that Deputy Johnson was aiming a gun directly at him and ordering him to get on the ground.[41] Deputy Johnson's Glock .40 caliber handgun was fully-loaded and it had a bullet in the chamber.[42] Deputy Johnson stated that he was concerned for his own safety and the safety of others on the property because "anything could go" if he allowed Clayton to enter the open area.[43] A reasonable officer in this situation would have reason to believe that Clayton was only steps away from being in a position to wrestle the gun from the officer and to hurt or kill others on the premises.

Moreover, with Clayton coming towards the officer in close proximity, throwing his hands in the air and yelling, "I'm going to make you shoot me motherfucker," Deputy Johnson was not facing a mere "latent threat" that had yet to "materialize[] into a risk of harm." *Reyes*, 2010 WL 271422, at *4. Clayton was actively resisting and threatening imminent harm when Deputy Johnson made a split-second decision during a situation that was "tense, uncertain, and rapidly evolving." *Ramirez*, 542 F.3d at 130 (quoting *Graham*, 490 U.S. at 397). Faced with this immediate threat of serious harm, Deputy Johnson was not required to wait until Clayton was on top of him and attempting to physically overcome him before taking action to protect himself and others. As the U.S. Court of Appeals for the Fifth Circuit has recognized,

> The Fourth Amendment does not require police officers to wait
> until a suspect shoots to confirm that a serious threat of harm

---

[41] Plaintiffs' argument that Deputy Johnson did not give a warning before using deadly force is meritless. Clayton repeatedly yelled at Deputy Johnson, who was pointing a gun at him, to shoot him as he continued to advance on him and ignore his commands to get on the ground. *See, e.g.*, *Btesh*, 2011 WL 3269647, at *20 ("Although Officer Denicola did not verbally warn Btesh that she would shoot before firing upon him, she and Officer Payne provided unspoken warnings by maintaining their guns drawn while commanding Btesh to stop and show his hands.").

[42] R. Doc. No. 53-8, at 13:20-13:50.

[43] *Id.* at 12:30-13:00.

33

> exists. The court's comment that officers could have [utilized a
> different tactic] is, unfortunately, a suggestion more reflective of
> the 'peace of a judge's chambers' than of a dangerous and
> threatening situation on the street.

*Ramirez*, 542 F.3d at 130 (quoting *Elliot v. Leavitt*, 99 F.3d 640, 643 (4th Cir. 1996)). Deputy

Johnson believed that Clayton posed an imminent threat and this Court will not "second guess

the timing of that realization" by failing to take into account the reasonable beliefs of an officer

standing steps away from a defiant, disturbed, and obviously dangerous man. *See Ramirez*, 542

F.3d at 130.

Finally, the Court notes that plaintiffs have attempted to "inject impermissible hindsight

into the analysis" by suggesting that Deputy Johnson could have (possibly) prevented Clayton's

death by waiting for the SRT team to handle the situation, or relying on less-than-lethal methods

of restraint. *See Btesh*, 2011 WL 3269647, at *23. As to the argument that Clayton failed to

follow proper police protocol by pursuing Clayton without the SRT team, the Fifth Circuit has

consistently recognized that "[e]ven where an officer acts negligently and contrary to police

procedure, this court has failed to recognize a constitutional claim where an officer used deadly

force in response to a reasonable belief that an individual posed a threat of serious harm."

*Ramirez*, 542 F.3d at 129-30 (citing *Young v. City of Killeen*, 775 F.2d 1349, 1350-53 (5th Cir.

1985)); *see also Mace*, 333 F.3d at 625 ("Although, in retrospect, there may have been

alternative courses of action for [the officer] to take, we will not use 'the 20–20 vision of

hindsight' to judge the reasonableness of [an officer's] use of force."). The analysis turns,

instead, on whether the use of force was objectively reasonably in response to the acts that led

the officer to discharge his weapon. *See id.* Because this Court finds that Deputy Johnson's use

of force was justified by the presence of an immediate threat of serious harm or death to himself

34

or others, the Court does not find that Deputy Johnson's conduct violated the Fourth Amendment.

### D. Whether The Law Was Sufficiently Clear That A Reasonable Officer Would Have Known That Shooting Clayton Violated The Constitution

The Court further finds that even if Deputy Johnson's conduct violated the Fourth Amendment, a reasonable officer in his position would not have known that using deadly force was unlawful in light of clearly established law. Federal courts have long recognized that "[i]t is clearly established that use of deadly force is unreasonable unless an officer has 'probable cause to believe that the suspect pose[es] a threat of serious harm to the officer or to others.' " *Ramirez*, 542 F.3d at 129 (quoting *Mace*, 333 F.3d at 624; *Garner*, 471 U.S. at 11). However, with respect to the second step of the qualified immunity analysis, "the central concept is that of fair warning." *Lytle*, 560 F.3d at 417 (quoting *Kinney v. Weaver*, 367 F.3d 337, 350 (5th Cir. 2004) (en banc) (internal quotations omitted)). "Thus, while the right to be free from excessive force is clearly established in a general sense, the right to be free from the degree of force employed in a particular situation may not have been clear to a reasonable officer at the scene." *Lytle*, 560 F.3d at 417 (quoting *Bush v. Strain*, 513 F.3d 492, 502 (5th Cir. 2008)). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Lytle*, 560 F.3d at 409 (quoting *Saucier*, 533 U.S. at 202)). For the reasons previously stated, it would not have been clear to a reasonable officer that using deadly force would violate the law in the particular circumstances of this case involving an imminent threat from a dangerous suspect, albeit unarmed for purposes of this motion. Accordingly, Deputy Johnson is entitled to qualified immunity and summary judgment as to the claims of excessive force.

## II. Remaining Claims

**A. Federal Claims Based on Failure to Provide Adequate or Timely Medical Attention**

Defendants contend that plaintiffs cannot establish a constitutional violation with respect to their claim that Deputy Johnson and/or Sheriff Graves failed to provide Clayton with adequate or timely medical attention. "The constitutional right of a pretrial detainee to medical care arises from the due process guarantees of the Fourteenth Amendment." *Mace*, 333 F.3d at 625 (citing *Wagner v. Bay City*, 227 F.3d 316, 324 (5th Cir. 2000)). "That right is violated if an officer acts with deliberate indifference to a substantial risk of serious medical harm and resulting injuries." *Id.* "Deliberate indifference requires that the official have subjective knowledge of the risk of harm." *Id.* at 625-26. "Mere negligence or a failure to act reasonably is not enough." *Id* at 626. "The officer must have the subjective intent to cause harm." *Id.*

Plaintiffs did not oppose the motion for summary judgment with respect to their claim that Deputy Johnson and/or Sheriff Graves failed to provide adequate or timely medical attention.[44] The dashboard camera on Deputy Fiske's unit clearly shows that first responders were on the scene at the time of the shooting. Deputy Fiske summoned the first responders within one minute of "shots fired" being reported, and within approximately twelve seconds of the time Clayton was secured in handcuffs. Plaintiffs offer no evidence demonstrating that defendants were deliberately indifferent with respect to Clayton's medical needs. Accordingly, defendants are entitled to summary judgment with respect to their claim that Deputy Johnson and/or Sheriff Graves were deliberately indifferent with respect to the need to provide adequate or timely medical attention.

**B.   Federal Claims Against Sheriff Graves Based on Failure to Train and/or Supervise**

---

[44] The Court notes that there is no evidence that Sheriff Graves was present at the scene of the shooting.

36

Defendants contend that any remaining claims against Sheriff Graves are rendered moot if the motion for summary judgment is granted in favor of Deputy Johnson.[45] The Fifth Circuit has held that "[a] sheriff not personally involved in the acts that deprived the plaintiff of his constitutional rights is liable under section 1983 if: 1) the sheriff failed to train or supervise the officers involved; 2) there is a causal connection between the alleged failure to supervise or train and the alleged violation of the plaintiff's rights; and 3) the failure to train or supervise constituted deliberate indifference to the plaintiff's constitutional rights." *Brumfield v. Hollins*, 551 F.3d 322, 329 (5th Cir. 2008) (quoting *Thompson v. Upshur County,* 245 F.3d 447, 459 (5th Cir. 2001)). Because this Court has already found that Deputy Johnson did not violate Clayton's constitutional right to be free from excessive force, plaintiffs cannot establish that Sheriff Graves was responsible for a violations of Clayton's rights. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799, 106 S. Ct. 1571, 89 L. Ed. 2d 806 (1986) (holding that a municipality may not be held liable under § 1983 where no constitutional deprivation has occurred); *Elizondo v. Green*, 671 F.3d 506, 510-11 (5th Cir. 2012); *Foster v. Carroll Cnty.*, No. 11-60726, 2012 WL 5398190, at *2 (5th Cir. Nov. 6, 2012) (unpublished); *see also Rios v. City of Del Rio, Tex.*, 444 F.3d 417, 426 (5th Cir. 2006) ("We have held that we 'use the same standard in assessing an individual supervisor's liability under § 1983' as that used 'in assessing a municipality's liability' thereunder.") (quoting *Doe v. Taylor ISD*, 15 F.3d 443, 453 (5th Cir. 1994) (en banc)). Accordingly, Sheriff Graves is entitled to summary judgment with respect to the claims against him in both his individual and official capacity.

### C. State Claims

Having determined that plaintiffs' federal claims must be dismissed, the Court declines to

---

[45] Plaintiffs concede that that they have discovered no facts indicating that Sheriff Graves' hiring and pre-employment screening played a role in this case and that they do not oppose summary judgment with respect to such claim. R. Doc. No. 55, p.5, n.18.

exercise supplemental jurisdiction over their remaining state law claims. *See* 28 U.S.C. § 1367(c)(3) ("The district court may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction."). "When a court dismisses all federal claims before trial, the general rule is to dismiss any [supplemental] claims." *Bass v. Parkwood Hosp.*, 180 F.3d 234, 246 (5th Cir. 1999) (emphasis in original). Moreover, "the Supreme Court has counseled that the dismissal of all federal claims weighs heavily in favor of declining jurisdiction." *McClelland v. Gronwaldt*, 155 F.3d 507, 519 (5th Cir. 1998), *overruled on other grounds by Arana v. Ochsner Health Plan*, 338 F.3d 433 (5th Cir. 2003)). "Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726, 86 S. Ct. 1130, 16 L. Ed. 2d 218 (1966). "However, the dismissal of the [supplemental] claims should expressly be *without* prejudice so that the plaintiff may refile his claims in the appropriate state court." *Bass v. Parkwood Hosp.*, 180 F.3d 234, 246 (5th Cir. 1999) (emphasis in original). Balancing considerations of judicial economy, convenience, fairness to litigants, and comity, the Court declines to exercise supplemental jurisdiction over plaintiffs' remaining state law claims. *See Gibbs*, 383 U.S. at 726.

## CONCLUSION

For the foregoing reasons,

**IT IS ORDERED** that the motions for summary judgment are **GRANTED**. Plaintiffs' § 1983 claims against all defendants are **DISMISSED WITH PREJUDICE**.

38

**IT IS FURTHER ORDERED** that plaintiffs' remaining state law claims are **DISMISSED WITHOUT PREJUDICE**.

New Orleans, Louisiana, November 16, 2012.

_____
**LANCE M. AFRICK**
**UNITED STATES DISTRICT JUDGE**